Court. My name is Larry Greenwald. I'll be arguing on behalf of the appellant together with Ms. Kathy Bledsoe. Our intention, subject to the Court's wishes, is to take approximately 10 minutes for the opening argument and 5 minutes for rebuttal. Your Honors, this is the divide the argument at all? Or are you going to do it all? No, we are going to divide it. I propose to take approximately 10 minutes in the argument. Ms. Bledsoe will handle the rebuttal for approximately 5 minutes. Okay. Thank you, Your Honor. Any objection? No. Okay. Go right ahead. Your Honors, this is an appeal from an award by the Trial Court of Summary Judgment in favor of the defendant, Prudential Securities, Inc. The appellant, Plaintiff below, Dr. Jason Rosenbluth, alleged that he and others entered into an oral agreement with Prudential. The essence of the oral agreement was that the parties were to form a venture capital fund of up to $200 million. The basic division of responsibilities was that Prudential agreed to provide $50 million toward the institutional part of the fund, agreed to provide any shortfall to an additional $50 million for the institutional part of the fund. And in addition to that, there was to be a retail part of the fund, and money for the retail part of the fund was to come from high net worth investors, which Prudential had a stable of, as well as from investors in a prior fund, a very similar fund called Bedrock. This fund that was to be developed was a sequel to Bedrock. Dr. Rosenbluth's role, and the role of one other key principal person who is not a party to this case, was to find investment-worthy companies, make the investments, and monitor the investments and report on them to the various investors. He promised to do that. Prudential promised to do what I just described, and that was the essence of the transaction. The parties negotiated this agreement over a period of months. There were some open issues remaining, and Dr. Rosenbluth has alleged and has affirmed by declaration filed in the 2000. Shortly after that meeting, Prudential underwent a serious upheaval. The person in charge of the basic part of Prudential, which was to participate in this fund, departed. His name was Whit Simmons. And the person who was the key negotiator on behalf of Prudential with respect to this, his name was Vin, Vincent Pica, also departed. Bearing in mind that in Dr. Rosenbluth's view, the oral agreement was entered into, finally concluded on October 4th, internal documents of Prudential, which we received in discovery, show that about three weeks later, on It did not inform Dr. Rosenbluth or the other key principal at that time. It did inform Dr. Rosenbluth on or about November 9th that things were on hold. And it is significant that once things went on hold, nothing ever got on track. Despite efforts by Dr. Rosenbluth to salvage the deal by making contact with the new people and others, the deal never got off the ground. And Dr. Rosenbluth, who was to participate in a very significant way in the projected rewards of the project, sustained very heavy losses. Now, the case came to the trial court on a motion for summary judgment by Prudential. On summary judgment, of course, the evidence of the non-movement, in this case Dr. Rosenbluth, is to be believed, and all justifiable inferences drawn in his favor. And I submit with respect, had that basic principle been followed at the trial level, summary judgment would have and should have been denied. The trial court, however, granted summary judgment in favor of Prudential, citing four essential reasons. I would say the most serious reason, even though it wasn't the first reason that the lower court cited, was that no reasonable jury in the trial court's view could find that there was a binding contract. And that is a fair starting point. Dr. Rosenbluth submitted a declaration at the trial court level setting forth what he said were the terms of the oral agreement. I suggest to this Court that if those terms were in writing, signed by the parties, there would simply be no question but that there was a contract. And if this Court agrees with me on that basic proposition, then it follows the fact that it was oral rather than in writing, makes it no less a binding contract. There was strong evidence that even Prudential thought there was a binding contract, because shortly after this October 4th meeting, which I mentioned earlier, Mr. Pica, the person who was the key negotiator on behalf of Prudential, congratulated Dr. Rosenbluth and the other key principal, whose name was Tom Volpe, on entering into the deal. Mr. Pica then sent an e-mail, which we've quoted at page 14 of our opening brief, an e-mail to another key Prudential official, a vice president, and she wrote back saying, Vin, I was thrilled to hear the good news, which went on to say, well, make this our top priority. We're going to set up meetings and so forth. This executive of Prudential, again, right after October 4th, then sent a similar e-mail to Mr. Volpe, who was the other principal. It was principal working with Dr. Rosenbluth on this. As these parties were having the discussions that your client contends resulted in an oral and enforceable agreement, were lawyers drafting documents? The answer is, yes, they were drafting documents, but it's important to consider what documents they were drafting. It is our contention that an oral contract was formed as of October 4th. In order to implement that oral contract, in order to actually establish the venture capital fund, there needed to be documents prepared, and that was anticipated. For example, a private placement memorandum needed to be prepared. The structure that the parties had agreed to involved the creation of certain entities, a management company, a limited partnership, a general partnership. So the answer to your question, Your Honor, is yes, those documents were being prepared, but those documents, which weren't completed and never got completed, were in furtherance of the oral agreement, were in part performance, if you will, of the oral agreement, and were independent of the oral agreement in the sense that the fact that they weren't prepared, and even assuming there were some open terms in those documents, does not bear on whether or not there was an enforceable oral agreement on October 4th. The district court explained as one of its grounds for the summary judgment grant that the contemplated agreement, whether it was enforceable or not, putting that aside for the moment, assumed the participation of Paul Brown, and that he was not present at the trial, and that he became unavailable, and that that unavailability excuses any required performance under the agreement, oral or not. What's your position on that? That that is a very good example of the trial court not drawing inferences in favor of Dr. Rosenbluth. You see, Your Honor, Paul Brown's withdrawal from Prudential was effectuated on November 13th. That was after Prudential had informed Dr. Rosenbluth that the deal was on hold, and it was substantially after Prudential in its internal machinations put the deal on hold. So the agreement that your client seeks to enforce involves the fact that it involved the expenditure of substantial sums of money, didn't it? That is correct. Like $200 million? Well, the two of its 10 million or 200, it involved, it contemplated the expenditure of a serious amount of money, right? That is accurate. There was serious dollars involved in starting the Venture Capital Fund. And the Venture Capital Fund itself was to be in the range of $200 million, which was to be, it's not expenditure, but that was to be invested in investment-worthy companies, and that is the heart of what hopefully would yield a very serious profit for the investors. Aren't arrangements of this type involving these kinds of money in the form of a company's reduced-to-writing normality? Your Honor, my best answer to you is no, even though it's counterintuitive to say that. A good example of where it wasn't reduced-to-writing is a case we've cited, Texaco v. Pennzoil, which was decided under New York law, which was an instance of an oral contract. The issue there was whether there was tortious interference with contract. There had to be a contract before there's tortious interference. That involved a jury award of something like $7 billion in compensatory damages, which was upheld on appeal. That's an example of a situation where there was far more involved than here, in which a jury and a court on appeal said oral contract is fine. There's nothing in the record to show whether these types of deals are customarily embraced through a written contract. There is testimony by Mr. Volpe, who talked about writings being completed, but I believe he was talking about the closing, that is, before the investors actually put the money in, everything had to be reduced-to-writing. From your client's point of view, at what point in time was there an agreement? On October 4, 2000. When what happened? When the open issues, beyond the issues which had been negotiated in the preceding months, were resolved, and it was shortly after that that these e-mails that I referred to earlier, by prudential, were written saying, congratulations. Your Honors, I see I have very little time left, and I'd like to leave it for Ms. Bledsoe for a moment. We'll make sure she has time to respond. Thank you for your argument, Counsel. I appreciate that. We'll hear from the other side at this time. Good morning. May it please the Court. I'm Gil Sirota for Prudential Securities. Let me start with responding to one of the questions that you asked, Judge Hawkins. The evidence in the record was undisputed that deals of this type are only made in writing. Mr. Volpe testified to that. He was a principal on Mr. Rosenbluth's side, that in 27 years of work in the industry, we had never seen an agreement for the formation of a venture capital fund done orally. Mr. Rosenbluth offered no contrary evidence to that, and Judge Alsop was well within his ability in granting summary judgment to rely on that fact and to rely on the complexity of the transaction. Dr. Rosenbluth testified that to put this deal together, you needed the three managers. That was Rosenbluth, Volpe, and Brown. They had to form a general partnership. The general partnership had to run a limited liability company, and the limited liability company was going to be a general partner of a partnership that would raise the money and invest the money, an LP. That money would be raised pursuant to a private placement of securities done by the limited partnership. Those were all undisputed facts, and it defies reality to suggest that that type of structure with that many moving parts could be decided in a meeting on October 4th, in which two of the principal parties are not even present. Now, counsel referred to Texaco v. Pennzoil, or Pennzoil v. Texaco, as an example of an oral contract, and I think counsel just simply made a mistake or didn't read the case. Because if you read that case, it is fundamentally different than this case, because in that case, there was a written memorandum of agreement signed by Getty on behalf of the shareholders of Getty Oil and signed by Pennzoil and approved by both boards of directors. And the issue in that case was not whether an oral contract was enforceable. It was whether the written memorandum of understanding approved by both boards of directors was sufficient even though it contemplated later documents to be prepared that were more complex. That case and this case are on different playing fields and are not even close to being the same. Well, what particular agreement or letter of agreement do you rely upon to say that this entire contract must be expressed in writing? Well, there's several. Each contract that was drafted after the October 4th meeting had an integration and merger clause in it. And specifically, the ones that are clearly in the record are the Gallinet, which was the management company that Dr. Rosenbluth was going to be part of, which is at the record at 581, and Gallinet was going to run a limited partnership, which is at the record at 655. Both of those agreements contained integration clauses. And the Second Circuit, in two cases relying on New York law, which is at least arguably applicable here, decided that when the parties prepare written agreements with merger or integration clauses in them, that is an expression of their view that the deal was only going to be made in writing because it excluded all oral agreements. It excluded all prior negotiations. The Ciamarella case from the Second Circuit calls it persuasive evidence, and the RG Group case, also a Second Circuit case, calls it conclusive evidence. So the fact that those two documents were drafted post-October 4th with merger integration clauses is clear evidence. There was also substantial evidence that no one believed an agreement was reached on October 4th, including the plaintiff. The plaintiff was asked in his deposition, at any time from October 4th to the day you filed this complaint in September 2002, did you ever take the position in writing or orally with credential that they had entered a binding agreement October 4th? His answer was no. And there were at least three undisputed documents, either from Dr. Rosenbluth or from his lawyers, Wilson Sonsini, that were totally inconsistent with an agreement being reached. And let me tell you what those three are very briefly. October 18th, there is an e-mail between Rosenbluth and his partner Volpe in which they are discussing eight deal points about how the general partnership would be run. That document, which is at the record at 474, suggests that those deal points, now that they've agreed on them, need to be run by Prudential, which is Mr. Buckalter, their attorney, and Paul Brown, their third partner. Obviously, if you're still talking about material deal points and you're still running them by your own partner and the other side, you don't have a deal. Document two, October 23rd, 19 days after this supposed agreement of October 4th, Wilson Sonsini, hired by plaintiff, circulates a 23-page term sheet for the same deal that he claims was made on October 4th. What's significant about that, and that, by the way, is at the record at 415, what's significant about that is there's not a word in the term sheet saying that it's confirming a prior agreement. Instead, it's a term sheet proposing material terms, and the material terms are significantly more detailed, significantly more comprehensive than the October 4th agreement that Dr. Rosenbluth suggested in his declaration. Then we have the third document that I want to refer to, which is very significant. On October 26th, we're now at 22 days after the meeting of October 4th, a settlement agreement with David Duval is drafted and circulated. Now why is this important? Mr. Duval was a prior investor in the First Bedrock Fund, prior manager of First Bedrock Fund. He had asserted a right to participate in the second fund, the follow-on fund. It was a material part of the deal in Dr. Rosenbluth's testimony that a settlement be reached with Duval, because they could not go forward with this new deal without his interests having been resolved. But the deal was never done. Duval wasn't at the meeting of October 4th. Duval never agreed to the terms. And the first time they're even circulating a draft settlement agreement is October 26th. So that is a – all of those documents show no agreement on material terms of October 4th. On that particular point, that could just be a condition preceding to finalization. So I don't give too much. Well, it's a condition preceding it failed, and then it would give Prudential a right to renegotiate the deal. Do we know that it failed? Was it ever presented? It was presented as never having been consummated. Dr. Rosenbluth was asked, do you have any evidence that Mr. Duval ever agreed to these terms? His answer was no, I have no evidence that he ever agreed to these terms. He never produced a settlement agreement. We didn't produce one because we didn't have one. So it never failed. But there's one other part of that that's really important. They're negotiating on October 4th with the understanding that a material term is the Duval settlement, and yet the Duval settlement hasn't even been drafted yet, and the material terms of that deal haven't even been made. So what that does is that goes back and underscores the absence of material agreement on October 4th, irrespective of the question of whether Duval ever agreed to it or not. Let me now turn to the last point, which is Paul Brown. Judge Hawkins, I believe, raised the issue of Mr. Brown. There's something very significant about this. The deal that Dr. Rosenbluth suggests was made on October 4th by his own testimony included Paul Brown managing $24 million part of that fund on his own with a separately calculated carried interest, a profit. What do we know when we take his deposition? Well, Paul Brown was never there. Paul Brown never agreed to the terms. They hoped he would. They were circulating documents for Mr. Brown's review as late as October 18th, and he still hadn't agreed, and yet he was a person whose background, whose track record was in all the documents, including the draft private placement memo, and if you look at each of the documents that was drafted to implement this agreement in Dr. Rosenbluth's terms, each of one had a signature line for Paul Brown, yet Paul Brown declined to participate. Now, they say, well, it's a disputed issue of fact as whether we could go forward without Mr. Brown. If the question was, could you come up with a different contract that contemplated a fund running without Mr. Brown, then that might be a disputed, a material disputed issue, but the contract that's trying to be enforced here is a contract with Mr. Brown as a manager running a $24 million fund, and yet he wasn't even at the meeting. And Dr. Rosenbluth produced no evidence, either by his testimony or by documentation, showing that Brown had ever agreed to the terms of that agreement. And so Mr. Brown's lack of participation and then his resignation really has two legal conclusions. One is a lack of agreement by the principal parties needed to agree on the deal, which makes the October 4th deal unenforceable. But when he resigns from the company and leaves, which there's no evidence linking that to anything else in the record other than counsel speculation, when he leaves, then the deal can't be done and has to be renegotiated, possibly could have been renegotiated, but regardless of that, neither party is bound by the earlier agreement, which presupposed Mr. Brown's participation. I do want to mention one other point that's in our brief and that I think is significant. Counsel said that Dr. Rosenbluth suffered heavy losses. It's undisputed that Dr. Rosenbluth paid not a penny of his own money on this deal. He was a fully employed employee, excuse me for being redundant, of Prudential Securities when he was negotiating this transaction. The only damages that he asserts in this case, and we got that from him in his deposition and in his declaration, is the profits that would have been made on a hypothetical amount of money raised by the limited partnership, not a penny of it was ever raised, invested in companies that he could not identify, with exit strategies that were purely speculative, and no one could tell whether they would have made money or not. There is not a more pure example of unenforceable speculative damages than the damages that Dr. Rosenbluth asserted in this case. Thank you. Okay. Thank you for your argument. Counsel Rebuttal. Good morning, Your Honors. Catherine Bledsoe on behalf of Dr. Rosenbluth. I'd like to address some of the points raised by Mr. Sirota, but I'll have to move quickly here. I'm going to start with Paul Brown. We're going to give you a couple of minutes. Oh, I appreciate that, Your Honor. Slow your pace down and go right ahead. Mr. Sirota said that there was no evidence that Paul Brown agreed to the terms of the fund. That simply misstates the record. Dr. Rosenbluth testified that the terms of Paul Brown's involvement in this fund were negotiated and agreed to before the October 4th meeting. And he also testified that Paul Brown agreed in advance of the October 4th meeting that he would abide by whatever terms the parties negotiated with respect to the rest of the fund. At the October 4th meeting, the parties agreed to the outstanding terms on the rest of the fund and did not change Paul Brown's arrangement whatsoever. Therefore, there was no requirement that they go back and get Paul Brown's agreement. Moreover What does that have to do with the fundamental issue that the parties here all agreed that they will only be bound by a written agreement? Your Honor, I don't think there is evidence that the parties agreed only to be bound by a written agreement. I think that that the record is very much in dispute. It's basically a factual issue whether the parties intended to be bound in the absence of a writing, and the facts are hotly disputed in this case. Let me turn to Paul Brown's resignation that Mr. Greenwald touched on. The district court found that that excused Prudential from breaching or backing out of the deal. And he also held that the record did not support an inference that Prudential backed off from the deal before Paul Brown resigned. And that is simply not accurate. The record shows that as early as October 27, Prudential, a senior Prudential executive instructed its marketing people to hold off on scheduling the kickoff events to market the fund to investors. When Volpe and Rosenbluth learned of this on November 9th, four days before Paul Brown resigned, they shot off an angry e-mail, what's going on here? And the Prudential executives confirmed that the deal was on hold. That was, once again, before Paul Brown resigned. Prudential never took the fund off hold. It just ground to a halt. They didn't proceed to move forward to market it to investors. They didn't proceed to move forward with the implementing contracts. The fund never took a step forward after that. In fact, what Prudential did start to do, it began dismantling the Prudential Volpe Technology Group, which was to provide the proprietary deal flow to the fund. So Prudential should not be able to take advantage of anything that happened after it put the fund on hold to excuse its breach. Let me turn briefly to Mr. Sirota's comment that the evidence is undisputed that this sort of deal could only be in writing. He turns to Volpe's testimony. It is clear that Volpe was talking about the closing of a deal, not an agreement to get it launched. Mr. Sirota also said that the court could rely on the complexity of the deal alone to determine that this should have been in writing. But that's just one of many factors. And here the parties were not starting from scratch. They were basing this fund on the bedrock fund. They were basing the legal implementing documents on the bedrock documents. And there is strong evidence in the record that the parties behaved as if they thought there was a binding agreement after October 4th. With respect to Texaco, he says that that case is in a completely different realm and was based on a written agreement. That, too, is inaccurate. In Texaco, there was a preliminary memorandum of understanding, but it expired by its own terms when the board did not approve it. The next day, Getty Board reconvened a meeting and Pennzoil proposed a new deal, which the Getty Board accepted.  And the question was, was that enough to constitute a binding contract? And I would submit that the factors there, the four tribune factors, were far weaker than in this case. The parties issued a joint press release, which said that the parties reached an agreement in principle. The transaction is subject to execution of a definitive merger agreement. The court found that was not dispositive. There was almost no partial performance in that case. Here, there is substantial partial performance. Okay. With respect to the outstanding, Gil Serota pointed to three documents which he claimed reflected that there were open terms. We would respectfully submit that they show nothing whatsoever. Those relate to the implementing documents, not to the oral agreement at hand. And there's nothing to suggest that those were unresolved terms. With respect to the October 18th email, it starts out, it's talking about the limited partnership, one of the implementing agreements. And Dr. Rosenbluth was simply answering the questions that Volpe had had about that agreement. With respect to the private placement memorandum term sheet, it had additional details. But that doesn't mean that those details were open terms or even that they were material. Remember that the parties were not starting from scratch. They had agreed to base this deal on the bedrock documents. In conclusion, we would ask the Court to view the evidence in its entirety in the light most favorable to Dr. Rosenbluth. And we think that if you do that, you will see that the issue of whether the parties intended to be bound by this contract in the absence of writing is an intensely factual issue, and the facts here are hotly in dispute and therefore not appropriate for summary judgment. This comes to us under summary judgment. Yes, it does, Your Honor. Thank you. Thank you. Thank both sides for their arguments. Very helpful, very interesting case. It's submitted for decision. And we'll now proceed to the next case on the docket this morning, which is the Securities and Exchange Commission against, I'm sorry, you are, I hope I'm pronouncing that right. I'm sure counsel will correct me.
judges: Lay , B. Fletcher, Hawkins